**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| NVF Company, et al. | ) | Case Nos. 05-11727(PJW) |
| | ) | |
| Debtors. | ) | Jointly Administered |

## MEMORANDUM OPINION

Mark D. Collins
Jason M. Madron
RICHARDS, LAYTON & FINGER, P.A.
One Rodney Square
920 North King Street
Wilmington, DE 19801

Counsel to NVF Company and
Parsons Paper Company, Inc.,
Debtors

Charles P. Lavelle
John J. Ferriter
Holyoke Law Department
City Hall Annex
Holyoke, Massachusetts 01040

Counsel to The City of
Holyoke Gas & Electric
Department, Creditor

Dated: September 26, 2008

**WALSH, J.**

This opinion is with respect to the Debtors', NVF Company ("NVF") and Parsons Paper Company, Inc. ("Parsons"), Third Omnibus Objection to Claims (Substantive) and Motion to Disallow, Reduce and/or Reclassify Such Claims (the "Motion to Disallow"). (Doc. # 650.) The General Unsecured Creditors Plan Trustee ("GUC Plan Trustee") supports the Motion to Disallow. The creditors, City of Holyoke ("Holyoke") and City of Holyoke Gas & Electric Department ("Holyoke Gas", collectively with Holyoke the "Holyoke Parties"), oppose the Motion to Disallow. For the reasons stated below, the Court will deny the Motion to Disallow.

## BACKGROUND

NVF was originally incorporated in 1905 as the National Fibre and Insulation Company. Its core product was vulcanized fiber, a converted cellulose product with valuable insulation properties. NVF Company also manufactured high pressure industrial laminates, printed circuit boards, custom-made commercial containers, and constructed numerous materials for end-users primarily in the United States and Canada. (Doc. # 650, ¶ 3.) Parsons, founded in 1853, was the first paper mill in Holyoke, Massachusetts. Through the centuries it survived the rise and fall of Holyoke's paper manufacturing industry. By 1999, Parsons was the only paper mill operating in Holyoke. It specialized in producing high-end products such as fine grade writing and

technical paper, and specialty products such as calender roll paper and art paper. (Doc. # 650, ¶ 4.)

NVF's headquarters were located in Yorklyn, Delaware and it owned manufacturing facilities in Delaware, Pennsylvania, and Massachusetts.  The Massachusetts facility, a mill building located at 84 Sargeant Street in Holyoke (the "Holyoke Property"), is the property at issue here.  It was leased to and operated by Parsons until it was shut down in 2004. (Doc. # 650, ¶ 5.)

On June 20, 2005 the Debtors filed a voluntary petition for relief under chapter 11 of title 11 of the Bankruptcy Code, 11 U.S.C. §§ 101 et seq.

On November 11, 2005, the Debtors filed a Notice of Intent to Abandon Certain Real and Personal Property (the "Abandonment Notice"), which included the Holyoke Property. (Doc. # 200.)  Holyoke objected to the Abandonment Notice, citing that there was approximately $1.5 million in real estate taxes due and owing to Holyoke. (Doc. # 266.)  On April 24, 2006, this Court held a hearing to consider, amongst other things, the Abandonment Notice.  At that hearing, Holyoke withdrew its objection to the Abandonment Notice and the Holyoke Property was abandoned on that date. (Doc. # 402.)

On April 28, 2006, Holyoke Gas filed a proof of claim in the amount of $218,285.65 as a priority claim.  This claim was for unpaid utility charges such as water, sewer, gas, electric, and

4

others.  Under Massachusetts law such unpaid utility charges become
real estate taxes owed by the fee owner of the real estate.  See
MGL c. 164, § 58D.  On May 19, 2006, Holyoke filed a proof of claim
in the amount of $1,405,939.54 as a priority claim.  It asserted
that the claim was for real estate taxes owed from 1998 to 2004.
(Doc. # 677, p. 2.)  Both the Holyoke Gas claim and the Holyoke
claim are on account of taxes assessed against Holyoke Property and
were assessed against the Holyoke Property prior to the date on
which the Holyoke Property was abandoned by the Debtors' estates.
(Doc. # 1111, ex. A, ¶ 8.)

On January 16, 2007, the Debtors filed the Motion to
Disallow.  In its Motion to Disallow, the Debtors claim that there
is no basis for Holyoke's claim of $1,405,939.54.  According to the
Debtors, "[t]he Debtors' books and records show no amount owed to
creditor." (Doc. # 650, Ex. 1.)  In the Motion to Disallow, the
Debtors seek to reclassify the Holyoke Gas claim of $218,285.65 as
an unsecured nonpriority claim. (Doc. # 650, Ex. 3.)  The Holyoke
Parties filed a joint opposition to the Motion to Disallow.  (Doc.
# 677.)  In that opposition, the Holyoke Parties cite applicable
Massachusetts law, an affidavit, and municipal lien certificates to
show the validity of the two claims.  The Debtors and the Holyoke
Parties entered into negotiations in an attempt to resolve their
differences regarding the two claims.  Those negotiations were
unsuccessful and on December 21, 2007, the Debtors filed its

5

Opening Brief in support of the Motion to Disallow as it relates to the Holyoke claim and the Holyoke Gas claim.  (Doc. # 1057.)  That brief sets forth two arguments as to why the Holyoke claim and Holyoke Gas claim should be disallowed.

First, the Debtors note that the Holyoke Parties are asserting their claims pursuant to Section 502(a) of the Bankruptcy Code.[1]  But according to the Debtors:

> Section 502(a) does not apply to property that has been abandoned by a trustee or debtor-in-possession.  See Swiatek v. Pagliaro (In re Swiatek), 231 B.R. 26, 28 (Bankr. D. Del. 1999)(noting that "once abandoned, the estate had no interest in it and § 502(a) applies only to property in which the estate has an interest"). . . . "As the Property in this case was abandoned by the Debtors and thus, is no longer part of the Debtors' estates, the Objecting Parties are not entitled to assert a claim against the Property or the Debtors.

(Doc. # 1057, pp. 9-10)

The second argument offered by the Debtors is that the claims should be disallowed in their entirety pursuant to § 502(b)(3).[2]  Nowhere in the Debtors' Opening Brief do they assert

---

[1] Identified sections of the Bankruptcy Code (11 U.S.C. §§ 101 et seq.) are cited herein as "§ ___."  Section 502(a) provides:

A claim or interest, proof of which is filed under section 501 of this title, is deemed allowed, unless a party in interest, including a creditor of a general partner in a partnership that is a debtor in a case under chapter 7 of this title, objects.

[2] Section 502(b)(3) reads:

that the claims should be disallowed on the basis of the position taken in its original Motion to Disallow--namely, that the Holyoke claim is found nowhere in the books and records of the Debtors and that the Holyoke Gas claim is not entitled to priority. Thus, I assume that the Debtors' original position for objecting have been abandoned and that it is relying solely on the two arguments set forth in its Opening Brief. Furthermore, it appears that the Debtors are not objecting to the amount of the two claims.

On March 30, 2007, the Debtors filed their plan of reorganization, along with their disclosure statement. This Court entered an order confirming the plan of reorganization on June 14, 2007. (Doc. # 912.)

## DISCUSSION

<u>Validity of the Creditors' Claims</u>

---

Except as provided in subsection (e)(2), (f), (g), (h) and (i) of this section, if such objection to a claim is made, the court, after notice and a hearing, shall determine the amount of such claim in lawful currency of the United States as of the date of the filing of the petition, and shall allow such claim in such amount, except to the extent that –

. . .

(3) if such claim is for a tax assessed against property of the estate, such claim exceeds the value of the interest of the estate in such property.

As a threshold matter, I find that the Holyoke Parties have met their burden of proof for asserting claims against the estate.  The Third Circuit Court of Appeals has held that "[t]he burden of proof for claims brought in the bankruptcy court under 11 U.S.C.A. § 502(a) rests on different parties at different times. Initially, the claimant must allege facts sufficient to support the claim."  Allegheny Int'l, Inc. v. Snyder (In re Allegheny Int'l, Inc.), 954 F.2d 167, 173 (3d Cir. 1992).  Then, the burden shifts to the objector who must produce evidence to refute the legal sufficiency of the prima facie claim.  Id. at 173-74.  I believe the Holyoke Parties met their initial burden of proof.  In their proofs of claim against the Debtors, they provided Municipal Lien Certification and other documents for municipal water, gas, and electric services that were incurred pre-petition, and real estate taxes assessed against the Holyoke Property in the years 1998-2004.

Section 502(a)

With the burden to refute on the Debtors, they rely on Swiatek v. Pagliaro (In re Swiatek), 231 B.R. 26, 28 (Bankr. D. Del. 1999), for the proposition that § 502(a) does not apply to property that has been abandoned by a trustee or debtor-in-possession. (Doc. # 1057, p. 9.)  The Debtors quote from Swiatek: "[O]nce abandoned, the estate had no interest in [the property] and § 502(a) applies only to property in which the estate has an interest."  In re Swiatek, 231 B.R. at 28.  This quote, according

to the Holyoke Parties "contain[s] a significant typographical error that is fatal to the Debtors' argument."  (Doc. # 1066, p. 2.)  I agree.

Reading the quote in context, I believe the <u>Swiatek</u> court was referring to § 506(a), not § 502(a).  The quoted statement was made when the court was discussing the U.S. Supreme Court's holding in <u>Dewsnup v. Timm</u>, 502 U.S. 410 (1992).  The relevant part of the <u>Swiatek</u> opinion reads:

> In <u>Dewsnup</u> the Court held that § 506(d) does not allow the strip down of a lien that is secured and has been fully allowed pursuant to § 502.  In <u>Dewsnup</u> the trustee had abandoned the property.  <u>The bankruptcy court reasoned that § 506(a) did not reach the property because, once abandoned, the estate has no interest in it and § 502(a) applies only to property in which the estate has an interest</u>. The district court and the Court of Appeals for the Tenth Circuit affirmed the bankruptcy court, as did the Supreme Court.

<u>In re Swiatek</u>, 231 B.R. at 28 (emphasis added).  In the referenced portions of <u>Dewsnup</u>, the Supreme Court summarized the bankruptcy court's holding:  "[The bankruptcy court] . . . reasoned that once property was abandoned it no longer fell within the reach of § 506(a), which applies only to 'property in which the estate has an interest,' and therefore was not covered by § 506(d)."  <u>Dewsnup</u>, 502 U.S. at 413-14.  The Supreme Court then summarized the Tenth Circuit's decision:  "Starting from the 'fundamental premise' of § 506(a) that a claim is subject to reduction in security only when

the estate has an interest in the property, the court reasoned that because the estate had no interest in abandoned property, § 506(a) did not apply . . . ."  Id. at 414.  From these statements it is clear that the Swiatek opinion contains a typographical error in referring to § 502(a) rather than § 506(a).  Consequently, the Debtors cannot use that error to refute the validity of the Holyoke Parties' claims.

Section 502(b)(3)

        The parties have stipulated that: (1) based on an appraisal dated June 19, 2002, the Debtors assert that the fair market value of the Holyoke Property is no more than $290,000, and (2) based on an appraisal dated October 10, 2007, the Holyoke Parties assert that the fair market value of the Holyoke Property is zero.  (Doc. # 1111, ex. A, ¶¶ 12-13.)  Having concluded that the Holyoke Property was of no value to the estate, pursuant to § 554(a) on April 24, 2006, the Debtors abandoned that property.[3] The Debtors' Abandonment Notice states:

> [T]he Debtors believe that the cost to market and sell the [Holyoke] Property would far exceed any value the Debtors would receive in connection with any such sale.  Moreover, the [Holyoke Property] is encumbered by a valid

---

[3] Section 554(a) provides:

After notice and a hearing, the trustee may abandon any property of the estate that is burdensome to the estate or that is of inconsequential value and benefit to the estate.

> and perfected security interest in favor of
> the City of Holyoke, Massachusetts and
> potentially others (collectively, the "Real
> Property Secured Parties"), and there is no
> equity for the Debtors' estates in excess of
> the valid and perfected liens of the Real
> Property Secured Parties.

(Doc. # 200, p. 1.) This is obviously an acknowledgment that there is no value in the property for anyone having an interest junior to Holyoke or Holyoke Gas.

In addition, the Holyoke Parties submitted an affidavit from Mayor of Holyoke, Michael J. Sullivan, dated October 18, 2007,[4] stating: "The Parsons building is not saleable in its current condition due to numerous building code violations that make demolition the most cost effective method of reuse of the property. The Parsons property is also contaminated with hazardous waste." (Doc. # 1036, ex. D, ¶¶ 4-5.) Mayor Sullivan also testified that the city has marketed the property for years and has received no serious offers "because of the tax lien of approximately $1.4 million, substantial demolition costs of $1.6 million, substantial hazardous waste remediation costs of $1.2 million, and substantial repair costs of $2.6 million." (Doc. # 1036, ex. D, ¶ 6.) Further, on June 10, 2008, the Holyoke Property was partially destroyed by a fire. (Doc. # 1111, ex. A, ¶ 16.)

---

[4]  Mayor Sullivan's affidavit was based on an October 9, 2007 Engineering Assessment. (Doc. # 1036, ex. D.)

Thus, as a practical matter, the Holyoke Property does not represent a source for the Holyoke Parties to be paid their tax claims.

The second argument the Debtors present in their Opening Brief is that the Creditors' claims should be disallowed pursuant to § 502(b)(3).  The Debtors and the GUC Plan Trustee argue that this case falls squarely within the plain meaning of § 502(b)(3) and that the statute requires the Holyoke Parties' claims be disallowed.  The Holyoke Property was abandoned by the Debtors after the petition date, and therefore it has no value to the estate.  As such, the value of the tax liens on the Holyoke Property exceeds the value of the Holyoke Property by the entire amount of the tax liens.  Thus, according to the Debtors and the GUC Plan Trustee, pursuant to § 502(b)(3) the entire amount should be disallowed. (See Doc. # 1057, pp. 10-14; # 1058, pp. 2-3.)

The Holyoke Parties contend that the plain language of § 502(b)(3) should not be applied here because it would lead to a result demonstrably at odds with the intention of the drafters. They argue that Congress intended § 502(b)(3) to prevent a situation where the bankruptcy estate's payment of taxes would remove the tax claims which would have remained on the real estate and be charged against the successor purchasers of the real estate, thereby causing injustice upon unsecured creditors.  (Doc. # 1036, p. 3.)  Given the fact that it was abandoned by the Debtors, is in

dilapidated condition, was partially destroyed by fire, and has significant environmental contamination, the Holyoke Property is unmarketable.  Therefore, the bankruptcy estate is the Holyoke Parties' only recourse for collecting the taxes and is not in the situation that the legislature sought to prevent with § 502(b)(3). (Doc. # 1036, p. 5.)

The facts of this case do seem to fall within the text of § 502(b)(3) and a strict application of the plain meaning would yield the result advocated by the Debtors and the GUC Plan Trustee. When a court interprets a provision of the Bankruptcy Code, "[t]he plain meaning of [a statute] should be conclusive, except in the 'rare cases [in which] the literal application of a statute will produce a result demonstrably at odds with the intention of its drafters.  In such cases, the intention of the drafters, rather than the strict language, controls.'" United States v. Ron Pair Enter., 489 U.S. 235, 242 (1989) (quoting Griffin v. Oceanic Contractors, Inc., 458 U.S. 564, 571 (1982) (internal quotations omitted)); Morgan v. Gay, 466 F.3d 276, 278 (3d Cir. 2006).

I believe this is one of those rare cases where such a strict application would produce a result that is demonstrably at odds with the legislative intent.  In such cases, "a court's primary role is to effectuate the intent of Congress even if . . . the statute instructs otherwise." Morgan, 466 F.3d at 278.  The Third Circuit Court of Appeals did so in Channel Home Ctrs. Realty

Corp. v. Channel Home Ctrs., Inc., 989 F.2d 682 (3d. Cir. 1993).
The debtor filed a motion for a second extension to accept or
reject leases.  The motion was filed beyond 60 days from the
petition date and within the time period granted within the first
extension.  Id. at 684.  The landlord objected to the second motion
and argued that the text of 11 U.S.C. § 365(d)(4) did not permit
the bankruptcy court to grant any extension beyond the 60 day
period.  Id.  The Third Circuit determined that "[t]his [was] one
of those rare cases," and such interpretation would not achieve
Congress's goal of preventing undue delay in the acceptance or
rejection of leases.  Id. at 687.  After inspecting the legislative
history of § 365(d)(4), the Third Circuit held that the section was
"framed and adopted without considering the question of second
extensions"; if Congress considered and wanted to prohibit second
extensions, it could have said so in the provision.  Id. at 688.

     Similarly, in Waugh v. Internal Revenue Serv. (In re
Waugh), 109 F.3d 489 (8th Cir. 1997), the Eighth Circuit Court of
Appeals had to decide whether the time period for determining the
dischargeability of tax liabilities was tolled during the pendency
of the prior bankruptcy proceeding.  The court held:

          [W]e conclude that this is such a "rare case."
          If we applied the plain meaning of section
          108(c) and held that the priority period of
          section 507(a)(8)(A)(i) is not suspended
          during bankruptcy proceedings, Congress's
          intent to afford the IRS a three-year priority
          period for the collection of taxes certainly
          would be frustrated.  Therefore, we concluded

> that the three-year priority period of
> section 507(a)(8)(A)(i) is suspended by 11
> U.S.C. § 108(c) and 26 U.S.C. § 6503(b) and
> (h), for the time that the automatic stay
> prevents the IRS from collecting outstanding
> tax debts.

Id. at 493; see also Saunders v. United States, 240 B.R. 636
(Bankr. S.D. Fla. 1999)(adopting the holding in Waugh); Lichter v.
Internal Revenue Serv. (In re Lichter), 1999 Bankr. Lexis 1904, *12
(Bankr. D. Md. 1999) ("This court agrees with the majority
conclusion as expressed in Waugh."). See, e.g., In re Steinhaus,
349 B.R. 694, 705 (Bankr. D. Idaho 2006)("This [c]ourt agrees with
Rowe that the phrase 'allowed claim' in § 521(a)(6) is one of those
'rare cases.' There is no logical reason why Congress would
differentiate between creditors in asset cases and those in no
asset cases, allowing the former but not the latter relief if
debtor use a 'ride through.' And the Court is unaware of Congress
ever articulating any such distinction.") (internal citation
omitted); Creditor's Comm. Chairman v. Fibrex, Inc. (In re Fibrex,
Inc.), 270 B.R. 714, 717-18 (Bankr. S.D. Ind. 2001) (holding that
the legislative intent of 11 U.S.C. § 503(b)(3)(F) does not permit
the court to grant administrative expense priority for compensation
paid to professionals hired by the committee without the court's
approval); Woloshin, Tenenbaum and Natalie, P.A. v. Harris (In re
Harris), 203 B.R. 558, 560 (Bankr. D. Del. 1996) ("I conclude that
'the literal application of [§ 523(a)(15)] will produce a result
demonstrably at odds with the intentions of its drafters' and that

the literal statutory language of § 523(a)(15)(A) need not be followed. Therefore, I agree with the court in <u>Finaly</u> that only the debtor's spouse or former spouse can maintain an action under § 523(a)(15).") (internal citation omitted); <u>In re Kirkish v. Meritor Sav. Bank</u>, 144 B.R. 367, 369 (Bankr. W.D. Mich. 1992) (holding that 11 U.S.C. § 523 (a)(8) does not prohibit co-maker or co-signers of a student from discharging the debt because "[t]he legislative history, clearly focusing on the student's non-dischargability, compels a narrow interpretation of what constitutes an education loan so as not to include co-makers or co-signers within [the provision].").

Section 502(b)(3) originated from the second proviso of section 64a(4) of the 1898 Act. Section 64a(4) granted priority to tax authorities' claims, and the second proviso prohibited distribution for a tax assessed against the bankrupt's property when the assessment exceeded the value of the estate's interest. 4 COLLIER ON BANKRUPTCY, ¶ 502.LH [2][c][i] (Alan N. Resnick & Henry J. Sommer eds., 15th ed. rev. 2008). The proviso was amended in 1926 and again by the 1938 Chandler amendments to the 1898 Act, which expanded the proviso to include any property of the bankrupt, personal and real. <u>Id.</u> The expansive amendment was

> Congress's response to a situation that often
> saw estates almost entirely depleted by taxes
> to the detriment of unsecured creditors - in
> spite of the fact that the property was often
> thereafter abandoned to mortgagees or the
> taxing authorities. This was so because the

> taxes were construed, under many state statutes, to be taxes legally due and owing by the bankrupt personally although such tax debt might result in liens on the real estate.

<u>Id.</u>  It sought to prevent the injustice where

> [t]he payment of taxes from the bankrupt estate would have the effect of <u>clearing away tax claims which otherwise would have remained charges on the real estate in the hands of the mortgagees or the tax sales purchasers</u>.

<u>Id.</u> (emphasis added).

The legislative history sets forth a twofold purpose for § 502(b)(3).  First, and most importantly, "to prevent a windfall to mortgagees and other lienors who would unfairly benefit from the payment of property taxes that would otherwise remain charges on the property."  4 COLLIER at ¶ 502.03[4][a].  Second, "to prevent injustice to unsecured creditors."  <u>Id.</u>

The windfall intended to be denied by § 502(b)(3) is easily perceived.  A delinquent real estate tax can result in the tax being a lien against the real estate.  Of course, the tax is also a claim against the property owner.  If the property is abandoned or foreclosed upon by a mortgage holder, the mortgage holder or any other subsequent owner (such as in foreclosure) takes the property  subject to the tax lien.  Absent the application of § 502(b)(3), the taxing unit can collect from the debtor along with the unsecured creditors.  To the extent the tax is paid to the taxing unit in that fashion, there will be a reduction or elimination of the tax lien on the property to the benefit of the

successor owner.   The application of the provision precludes that
windfall to the successor owner.

Such windfall is unfathomable in this case because of the
Holyoke Property's negative value.   The Holyoke Property was owned
by NVF and operated as a paper mill by Parsons until it was closed
in 2004.   The property was abandoned by the Debtors in April 2006.
With respect to the tax liabilities, the pleading indicates that
the $1.4 million real estate taxes were for the years from 1998 to
2004, and the approximately $ 218,000 tax liens were for the
utility services secured prior to the petition date (June 20,
2005).   (See Doc. # 677, p. 2.)   In addition, Mayor Sullivan's
affidavit estimated that the Holyoke Property would require
demolition costs of $1.6 million, hazardous waste remediation costs
of $1.2 million, and/or repair costs of $2.6 million.   Further,
despite Holyoke's effort to market the Holyoke Property, there have
been no serious offers.   On the facts here, I conclude that Holyoke
will not be able to find any one who will purchase the Holyoke
Property for either (1) the cost of the tax liens and demolition
costs, or (2) the cost of the tax liens and the repair and
remediation cost.   Thus, there is no successor owner who would
benefit from the windfall that § 502(b)(3) seeks to prevent.

With regard to the second goal of the provision, the
Debtors argue that allowing the Holyoke Parties' claims would be
detrimental to the unsecured creditors.   (See Doc. # 1069, pp. 18-

19.)  They point out that the two goals of § 502(b)(3) are not mutually exclusive, but rather that they rely on each other in a cause and effect relationship.  (Doc. # 1069, p. 19.)  I agree with this analysis, but not the argument.  The two purposes are related such that in Congress's attempt to achieve its goal of preventing a windfall to the successor owner, it prevented the taxing authority from collecting its tax claim from the estate, thereby enlarging the pool of assets available for distribution to unsecured creditors.

It seems to me that the Holyoke taxing authorities are creditors similar to unsecured creditors.  The taxing units provided services (fire, police, and other services) that had value to and benefitted the Debtors' operations.  I view those services as being no different than the services and products provided by general unsecured creditors.  Indeed, state laws give taxing units preference over general unsecured creditors.  When the tax liability goes into default, the claim becomes a lien against a debtor's property.  Moreover, the lien is typically a priming lien--that is, the lien takes precedence over any prior consensual liens (and presumably even judgment liens).  This is illustrated by several states' tax lien laws.  See, e.g., 1 KATHLEEN M. MITCHELL, MASSACHUSETTS REAL ESTATE LIENS § 6.1.1 (2005) ("Generally, liens for unpaid real estate taxes and assessments and water and sewer charges take precedence over mortgages and other recorded liens

because they attach to the real estate as a whole."); Tex. Prop. Tax Code Ann. § 32.05(b) (2007) (". . . Except as provided by subsection (c)(1) . . ., a tax lien provided by this chapter takes priority over (1) the claim of any creditor of a person whose property is encumbered by the lien; [and] (2) the claims of any holder of a lien on property encumbered by the tax lien . . . ."); Md. Tax-Prop. Code Ann. §§ 14-804(b), 14-805(b)(2007) (Property tax is due on July 1 and on that date "liability for the tax and a 1st lien attaches to the personal property in the amount of the property tax due on the personal property."); In re Jones, No. 99-53171, 2000 Bankr. LEXIS 1999, *2-3 (Bankr. M.D. Ga. 2000) (citing O.C.G.A. § 48-2-56(d)(2)) ("Ad valorem tax liens are senior to all other security interest in the particular item of property taxed, and junior to security interest in all of the taxpayer's other property."); Grant S. Nelson, Symposium: A Festschrift in Honor of Dale A. Whitman: The Foreclosure Purchase by the Equity of Redemption Holder or Other Junior Interests: When Should Principles of Fairness and Morality Trump Normal Priority Rules?, 72 Mo. L. Rev. 1259, 1265-66 (2007) ("[T]he failure to pay real estate taxes is also increasingly viewed as waste – a tort.  This is also the Restatement view.  This concern for tax payment reflects the fact that a real estate tax lien trumps any other lien on real estate, even those that are prior in time.").

Furthermore, in examining the purpose of § 502(b)(3), the Court should bear in mind "Congress' historic concern for the collection of taxes due and owing to national, states and local governments." Lawler v. County of Henrico, 636 F.2d 68, 70 (4th Cir. 1980). Several provisions of the Bankruptcy Code make clear that Congress considers states' ability to collect tax due and owing important. Congress gave priority status and exemption from discharge to state tax obligations. Section 503(b)(1)(B) classifies all taxes "incurred by the estate, whether secured or unsecured, including property taxes for which liability is in rem, in personam, or both," except those included in § 507(a)(8), as administrative expenses entitled to second priority under § 507(a)(2). Those types of taxes described in § 507(a)(8) are given eighth priority and are exempted from discharge pursuant to § 523(a)(1)(A), regardless of whether "[a] claim for such tax was filed or allowed" or whether the tax was owed to the federal or state government. Congress stated that "[a] taxing authority is given preferred treatment because it is an involuntary creditor of the debtor. It cannot choose its debtors, nor can it take security in advance of the time that taxes become due." 4 COLLIER at ¶ 507.10[1][b] (quoting H.R. Rep. No. 595, 95th Cong., 1st Sess. 190 (1977)).

Outside of the context of bankruptcy, Congress passed the Tax Injunction Act, 11 U.S.C. § 1341, with "[t]he primary purpose

'to limit drastically federal court jurisdiction to interfere with so important a local concern as the collection of taxes.'" <u>Fisher v. Haber</u>, 1989 U.S. Dist. Lexis 12304 at *8 (S.D.N.Y. Oct. 17, 1989)(quoting <u>Rosewell v. LaSalle Nat'l Bank</u>, 450 U.S. 503, 533 (1981)).  Therefore, denying the Holyoke Parties' tax claims for services performed that they would have recovered except for the fact that they are taxing units would impede Holyoke's financing efforts, frustrate Congress's general interest in protecting states' ability to collect tax, and fly in the face of equity.

As for the cases the Debtors cite in support of their position, it is noteworthy that, unlike the case here, the taxing authority had some other avenue to recover their claims besides the estate, and that is what the courts implicitly based their holding on.  See In re Spruill, 78 B.R. 766, 768 (Bankr. E.D.N.C. 1987) (During the foreclosure sale, the secured creditors purchased the property in which they had security interests and then "made payments to [the county taxing authority] for taxes which had accrued, both pre-petition and postpetition, on the property which was the subject of the foreclosure."); In re Skinner Lumber Co., Inc., 35 B.R. 31, 31 (Bankr. D.S.C. 1983) ("Stuckey Lumber Company, a creditor secured by the abandoned property which may stand for the payment of the tax, if it is not paid by the estate . . . . "); <u>Davis v. Lamesa Independent School Dist. (In re Davis)</u>, 11 B.R. 621, 623 n.1 (Bankr. N.D. Tex. 1981) (In a separate order the court

had permitted the bank to foreclose on all of the inventory that the trustee had, including the property from which the creditor sought to recover <u>ad valorem</u> tax.); <u>Griffith v. City of Plainview, Tex. (In re Transco Corp.)</u>, 11 B.R. 310, 311-12 (Bankr. N.D. Tex. 1981) (After the public auction for the rolling stocks failed to generate bids sufficient to satisfy the secured creditor's claim, the guarantor liquidated the rolling stocks "and then paid to the taxing units the ad valorem taxes owed to each of them on account of the rolling stock.").

In addition to the above, I note that § 502(b)(3) was intended to apply only in the context of <u>ad valorem</u> tax.   The legislative history of the section explains:   "Paragraph (4)[5] requires disallowance of a property tax claim to the extent that the tax due exceeds the value of the property.   This too follows current law to the extent the property tax is ad valorem."   H.R. Rep. No. 595, 95th Cong., 1st sess. 353 (1977); S. Rep. No. 989, 95th Cong., 2d sess. 63 (1978), <u>reprinted in</u> 1978 U.S.C.C.A.N. 5787, 5849; <u>In re Duckwall-Alco Stores, Inc.</u>, No. 89-40642-11, 3-4 (Bankr. D. Kan. 1995).   <u>Collier</u> also states that "Section 502 (b)(3) relates only to <u>ad valorem</u> taxes on property and not to income taxes, sales taxes, social security taxes or any other

---

[5] In 1984, the paragraph (4) referred to was redesignated to paragraph (3).   Bankruptcy Amendments and Federal Judgeship Act of 1984, Pub. L. No. 98-353, § 445(b)(4), 1984 U.S.C.A.N. (98 Stat.) 333, 373.

taxes." 3 COLLIER at ¶ 502.03(4)[b][iii]; In re Pioneer Title Bldg. Ltd., 133 B.R. 822 (Bankr. W.D. Tex. 1991); In re Spruill, 78 B.R. 766 (Bankr. E.D.N.C. 1987).  Black's Law Dictionary defines ad valorem tax as: "a tax imposed proportionally on the value of something (esp. real property), rather than on its quantity or some other measure." BLACK'S LAW DICTIONARY 51, (7th ed. 1999).  The dispute here involves not just ad valorem taxes but also utility taxes.  Specifically, the Holyoke Gas claim is for utility services in the amount of $218,285.65 (See Doc. # 1036, p. 2.)  Section 502(b)(3) does not apply to these utility service taxes because they are not ad valorem taxes.

## CONCLUSION

For the reasons stated above, I find that allowing the Holyoke Parties' tax claims is within the intention of the drafters and not disallowed by § 502(b)(3).  The Debtors' Motion to Disallow is denied as to the claims of Holyoke and Holyoke Gas.  I cannot tell from the record before me whether the amount of these two claims includes post-petition interest.  Given the facts of this case, I do not believe that any post-petition interest can be allowed.  Furthermore, the record before me is insufficient to make a determination as to what extent the two claims are accorded priority pursuant to § 507(a)(8).